**7–ELEVEN, INC., Plaintiff/Counter-defendant,**

v.

**Douglas McEVOY, Defendant/Counter-plaintiff.**

**No. CIV.A. WDQ–02–3834.**

United States District Court,
D. Maryland,
Northern Division.

Jan. 28, 2004.

Leslie Paul Machado, Laurin H. Mills, Todd M. Richman, Nixon Peabody LLP, Washington, DC, for Plaintiff.

Harry M. Rifkin, Hodes, Ulman, Pessin and Katz PA, Towson, MD, for Defendant.

## MEMORANDUM OPINION

QUARLES, District Judge.

Pending are cross-motions for summary judgment filed by Plaintiff/Counter-defendant 7–Eleven, Inc. ("7–Eleven") and Defendant/Counter-plaintiff Douglas McEvoy.

### I. Background

This case arises out of the termination of Mr. McEvoy's 7–Eleven franchise agreement. McEvoy entered the franchise agreement ("agreement") with Southland Corporation, the predecessor of 7–Eleven, on January 27, 1994. Memorandum of Law in Support of Douglas McEvoy's Motion for Partial Summary Judgment on 7–Eleven, Inc.'s Verified Civil Complaint ("McEvoy Mot."), Ex. 2. As a 7–Eleven franchisee, McEvoy leased the store from 7–Eleven and received a percentage of the net profits as compensation. McEvoy Mot. at 3–4, McEvoy Ex. 2.

During McEvoy's tenure as a 7–Eleven franchisee, his relationship with the franchisor soured. McEvoy Mot. at 4. McEvoy frequently complained about changes in 7–Eleven's accounting practices which he claimed resulted in more errors. McEvoy Depo. at 14–27; Carter Depo. at 78–79, 84 (7–Eleven changed accounting system by no longer attempting to reconcile franchisee's reports with its own). McE-

voy also complained about a 7–Eleven program, the Central Distribution Center ("CDC"), which attempted to reduce wholesale costs by allowing franchisees to purchase goods through a centralized system rather than individual vendors. McIver Depo. at 37; Cox Depo. at 57. McEvoy also complained about 7–Eleven's failure to renovate and repair the premises. *See, e.g.,* McEvoy Depo. at 41–43 (indicating that his store needed renovations and updates); McEvoy Opp. at 17 (appearance of McEvoy's store made it difficult to compete with newer competitors' stores).

Starting in 1999, McEvoy repeatedly failed to make timely document submissions and bank deposits. *See, e.g.,* Adkins Aff. at ¶ 4; Adkins Aff. Attachment A; Adkins Aff. Attachment B; Adkins Attachment C; Adkins Aff. at ¶ 22. In July 2002, McEvoy notified 7–Eleven that he wished to sell his franchise. McEvoy Mot. at 4, McEvoy Ex. 6; McEvoy Depo. at 114. On October 28, 2002, 7–Eleven terminated McEvoy, citing numerous violations of the agreement. Adkins Aff. at ¶ 23; Agreement at ¶ 13. McEvoy claims that had he not been terminated, he would have been entitled to half of the new franchisee's fee and payment for his store's goodwill, which he valued at $100,000, upon its sale. McEvoy Mot. at 5.

After the notice of termination, McEvoy contends that 7–Eleven continued to treat him as a franchisee. McEvoy Mot. at 5–6. McEvoy received no salary during this period, and 7–Eleven filed for injunctive relief to eject him from the store in November 2002. *Id.* at 6 (injunctive relief sought when action was filed on November 25, 2002); *id.* at 9 (McEvoy was not paid after termination).

McEvoy vacated the store in December 2002 after settlement negotiations failed. McEvoy Mot. at 6. In addition to injunctive relief, 7–Eleven alleges: 1) breach of contract based on McEvoy's alleged failure to adhere to the Franchise Agreement; and 2) trademark infringement and dilution based on McEvoy's unauthorized use of 7–Eleven's intellectual property after the Franchise Agreement was terminated. Plaintiff/Counterclaim Defendant 7–Eleven, Inc's Motion for Summary Judgment on Count IV of its Complaint Against Defendant/Counterclaim Plaintiff Douglas McEvoy and on all Counterclaims, and Incorporated Memorandum of Law ("7–Eleven Mot.") at 2. Because McEvoy has left the store, 7–Eleven concedes that its claims for ejectment, recovery of chattel, and declaratory relief are moot. Plaintiff/Counterclaim Defendant 7–Eleven, Inc's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant/Counterclaim Plaintiff Douglas McEvoy's Cross–Motion for summary judgment ("7–Eleven Opp.") at 7.

McEvoy counterclaimed against 7–Eleven alleging: 1) breach of contract; 2) wrongful termination of contract in retaliation for McEvoy's complaints; 3) negligence; and 4) fraud. *See* McEvoy Counterclaim.

## II. Analysis

### A. Summary Judgment Standard

Summary judgment may be granted when the moving party shows that there is no genuine issue of material fact, and it is legally entitled to judgment. *See Kitchen v. Upshaw,* 286 F.3d 179, 182 (4th Cir. 2002), *citing* Fed.R.Civ.P. 56(c). If the moving party would not bear the burden of proof at trial, its initial burden is met by "pointing out" that the nonmoving party has not made a sufficient showing on an essential element of its case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party would bear the burden of proof at trial, it discharges its initial burden by offering evidence that, if undisput-

ed, would entitle it to judgment. *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 614 (4th Cir.1999).

■ After the initial showing, summary judgment will be granted unless the opponent produces evidence upon which a reasonable jury could return a verdict in its favor. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548, *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir.2002), *citing Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.[1]

### B. Plaintiff 7–Eleven's Claims Against McEvoy

1. Plaintiff 7–Eleven's Claims for Injunctive Relief, Ejectment, and Recovery of Chattels.

Both parties agree that because McEvoy has surrendered the store to 7–Eleven, summary judgment is appropriate for McEvoy on Count I (injunctive relief), Count V (Ejectment), and Count VI (Recovery of Chattels) of 7–Eleven's Complaint. 7–Eleven Opp. at 7 (acknowledging Counts I, V, and VI are now moot). Accordingly, summary judgment will be granted to McEvoy on these counts.

2. Trademark Infringement and Dilution

McEvoy seeks summary judgment on 7–Eleven's claims of trademark infringement and dilution because 7–Eleven allegedly consented to his use of the marks after the agreement was terminated. McEvoy Mot. at 8–10. McEvoy also contends that he did not use the marks in a manner incon-

sistent with, or damaging to, the 7–Eleven system. McEvoy Mot. at 8–9 (7–Eleven "incurred no compensable statutory or common law damages and is not entitled to recover attorney's fees"). Finally, McEvoy argues that because there is no evidence that he used the marks wilfully or in bad faith, 7–Eleven cannot recover attorney's fees or other special damages. McEvoy Mot. at 8–9.

■ Plaintiff 7–Eleven relies on its notice of termination and subsequent filing for ejectment to show that it did not consent to McEvoy's continued use of the trademarks. 7–Eleven Opp. at 7. McEvoy's admission that he did not receive profits after the agreement was terminated also indicates that 7–Eleven did not consent to his operation of the store. McEvoy Mot. at 9. Accordingly, there is a factual dispute about whether 7–Eleven consented to McEvoy's use of its trademarks after it terminated the agreement.

■ McEvoy's assertion that 7–Eleven was not damaged by his use of the marks does not require summary judgment in his favor on the infringement and dilution claims. With respect to the infringement claim, a franchisee's continued use of the franchisor's trademarks creates a sufficient likelihood of confusion to entitle 7–Eleven to at least nominal damages. *See U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1190 (6th Cir.1997), *citing, Burger King Corp. v. Mason,* 710 F.2d 1480, 1492–93 (11th Cir.1983) (franchisee's continued use of franchisor's trademark satisfies likelihood of confusion test); *see Motor City Bagels L.L.C. v. American Bagel Co.,* 50 F.Supp.2d 460, 486–87 (D.Md.1999) (infringement claim

---

1. The opponent's burden cannot be met with "speculative" or baseless allegations or a "mere scintilla" of evidence. *See Thompson,* 312 F.3d at 649, *citing Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 287 (4th Cir. 1999). However, all justifiable inferences will be drawn in favor of the non-moving party. *Phillips,* 190 F.3d at 287–88, *citing Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

survived summary judgment where plaintiff would be entitled to nominal damages on infringement claim).

■ Though dilution claims require evidence of actual confusion, that requirement is satisfied when, as here, the defendant uses the plaintiff's mark. *Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418, 434, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003) ("[D]irect evidence of dilution ... will not be necessary if actual dilution can reliably be proven through circumstantial evidence— the obvious case is one where the junior and senior marks are identical"). Accordingly, McEvoy's contention that his use of 7–Eleven's mark was harmless does not entitle him to summary judgment. *See id.; Motor City Bagels,* 50 F.Supp.2d at 486–87.

■ To recover attorney's fees 7–Eleven must show that the defendant acted in bad faith. *The Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 600 (4th Cir.1992). A showing of wilfulness also permits a plaintiff to recover 15 U.S.C. § 1117(a) damages in a dilution case. 15 U.S.C. 1125(c)(2); 15 U.S.C. § 1117(a). Because the bad faith determination largely depends on the credibility of McEvoy's assertion that he thought 7–Eleven consented to his continued operation of the store, a jury must decide whether he acted in bad faith. *See, e.g., Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1563, 1567 (11th Cir.1986) (award of attorney's fees under § 1117(a) was not abuse of discretion when franchisee continued to use franchisor's trademarks after termination of franchise agreement).

### 3. Breach of Contract

#### a. Termination of Agreement

The agreement unambiguously permitted a franchisee's termination because of the repeated failure to provide records or reports to 7–Eleven and the failure to maintain the required Net Worth. Agreement ¶ 28(a)(ix), (b)(d); *see also Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358 (1999) (noting importance of Court strictly adhering to clear and unambiguous contract terms).[2] It is undisputed that McEvoy repeatedly failed to submit vendor invoices and logs to 7–Eleven on a timely basis and that 7–Eleven repeatedly warned McEvoy that these failures were material breaches of the agreement. 7–Eleven Mot. at 6; Adkins Aff. at ¶ 4(untimely submissions of vendor logs during February 1–28, 1999); Adkins Aff. Attachment A (March 18, 1999 letter describing failure to timely submit vendor logs for February 1–5 and 16–28, 1999 and notifying McEvoy that the failure breached agreement); Adkins Aff. Attachment B (September 20, 1999 Notice of Material Breach for Late Paperwork for failure to timely deliver Logs and Cash Reports for August 1–31, 1999, noting that McEvoy "must cure this breach ... by immediately and continuously complying with the terms of the Agreement by delivering to 7–Eleven all records or reports in the forms and by the times required under the Agreement" and reserving the right to terminate McEvoy if he "continued to deliver late paperwork"); Adkins Aff. ¶ 9 (late payments continued after September 20, 1999 letter); Adkins Attachment G (May 4, 2001 letter indicating that recipient had not delivered required paperwork in month of April and

---

2. McEvoy's argument that the breaches did not tangibly harm 7–Eleven is irrelevant because both parties agreed that the breaches at issue warranted termination. Agreement at ¶ 28 (termination provision); *id.* at ¶ 11 ("If,

at any time in 7–Eleven's sole opinion, there has been a Material Breach by FRANCHISEE ... the unpaid balance in the Open Account shall be immediately due and payable").

explaining reasons for submissions); Adkins Attachment I (October 18, 2001 letter to McEvoy informing him that daily purchase summaries from September 14–30, 2001 were untimely); Adkins Attachment L (May 30, 2002 letter to McEvoy informing him of untimely vendor logs for April 1–26, 2002 which indicated that four material breach notices had issued in three years); Adkins Attachment N (October 15, 2002 letter to McEvoy indicating untimely delivery of vendor logs for August 24 to September 27, 2002).

It is also undisputed that McEvoy repeatedly failed to make timely deposits into 7–Eleven's accounts. Adkins Attachment C (November 18, 1999 letter to McEvoy indicating 13 late deposits between October 17 and November 7); Adkins Attachment E (February 7, 2001 letter to McEvoy indicating that failure to deposit $20,204.56 over two-day period and allowing three days to cure this material breach of the agreement); Adkins Attachment F (April 18, 2001 letter to McEvoy indicating seven late deposits from March 6 to April 3); Adkins Attachment H (July 6, 2001 letter to McEvoy indicating seven late deposits from June 10 to June 25); Adkins Attachment J (April 25, 2002 letter to McEvoy indicating 14 late deposits from March 17, 2002 to April 17, 2002); Adkins Attachment M (August 26, 2002 letter indicating material breach for 17 untimely deposits from July 7, 2002 to August 6, 2002). McEvoy also repeatedly failed to submit receiving logs and cash reports on a timely basis. Adkins Attachment D (January 5, 2000 letter to McEvoy indicating he materially breached agreement by failing to timely deliver Receiving Logs and Cash Reports for December 1–31, 1999).

Finally, 7–Eleven has presented undisputed evidence that McEvoy, who was required to maintain at least $10,000 in net worth, maintained a negative net worth at the time of his termination. Adkins Aff. ¶¶ 22–23.[3]

■ McEvoy argues that these breaches were excused by 7–Eleven's breaches of the agreement. McEvoy Opp. at 24 ("7–Eleven's claims also fail because of its own breaches of contract which give rise to McEvoy's affirmative defenses and counterclaims").

Had 7–Eleven breached the agreement before McEvoy breached, he could have: 1) treated 7–Eleven's breach, if material, as a repudiation of the agreement and discontinued his performance and acceptance of benefits under the agreement; or 2) treated the breach as a partial breach and sued for damages. *S & R Corporation v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir.1992). McEvoy could not respond to 7–Eleven's breach by reaping the agreement's benefits while discontinuing his performance under the agreement. *Id.* Accordingly, McEvoy cannot assert 7–Eleven's alleged breaches of the agreement as an affirmative defense to his breaches of the agreement.

■ The agreement expressly authorized 7–Eleven to terminate McEvoy's franchise because of his repeated breaches of the agreement. Agreement at ¶ 28; *McDonald's Corporation v. Robertson*, 147 F.3d 1301, 1309 (11th Cir.1998) (repeated breaches of franchise provisions amounted to material breach of agreement which justified franchisor's termination of franchisee); *S & R Corporation*, 968 F.2d at 375 (holding "a franchisor's right to terminate a franchisee exists independently of any

---

**3.** McEvoy contends that his negative net worth is the product of 7–Eleven's application of a default 38% mark-up on products; McEvoy has never offered evidence of positive net worth. McEvoy Opp. at 34 ("7–Eleven's use of the arbitrary 38% retail markup was calculated to lead to a misrepresentation of the net worth of the franchise"); McEvoy Opp. Ex. 3 (7–Eleven Memorandum Announcing markup procedure).

claims the franchisee might have against the franchisor. The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated"). McEvoy was repeatedly warned about his repeated breaches and given time to cure those breaches before his termination. *See, e.g.,* Adkins Attachment L (May 30, 2002 letter to McEvoy informing him of untimely vendor logs for April 1–26, 2002 and indicating that four material breach notices had issued to McEvoy in past three years). McEvoy breached the agreement as a matter of law and was properly terminated. Agreement at ¶ 28. Accordingly, summary judgment for 7–Eleven will be granted on its breach of contract claim.

### b. Damages

■ The agreement states that in the event of a material breach, the unpaid balance in an open account "shall be immediately due and payable." Agreement ¶ 11. Plaintiff 7–Eleven has offered evidence that McEvoy owes $16,837.64. 7–Eleven Mot. at 8; Hanson Depo. at 42, 7–Eleven Mot. Ex. E.

McEvoy argues that there is a genuine dispute of material fact about the accuracy of 7–Eleven's accounting. McEvoy Opp. at 22. There is some evidence that 7–Eleven has not accounted for discrepancies in McEvoy's account. Carter Depo. at 38 (indicating that some discrepancies in McEvoy's account may not have been addressed). Additionally, McEvoy argues that the final accounting is incorrect because it does not adjust for invoices Klein Wholesale Distributors sent to 7–Eleven and fails to give credit for "non-standard

inventory" that McEvoy sold. McEvoy Sworn Statement at ¶ 3.

Although McEvoy has not submitted his own figures to create a conflict about the accuracy of 7–Eleven's damages computation, the testimony of Ms. Carter raises issues regarding the accuracy of 7–Eleven's current figures.

Plaintiff 7–Eleven's response, that it has made some credits to McEvoy's account, does not mean that all necessary credits have been made. 7–Eleven Opp. at 6 ("McEvoy does not dispute, however, that 7–Eleven made approximately $22,000 in correction in his favor" after the time that Ms. Carter had indicated there were still accounting discrepancies).

■ The dispute about the accuracy of 7–Eleven's accounting precludes summary judgment. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 81 (5th Cir.1987) (motion for summary judgment must be denied if credibility issues exist); *Carroll v. United Steelworkers of America,* 498 F.Supp. 976, 978 (D.Md. 1980), *aff'd without op.,* 639 F.2d 778 (4th Cir.1980) (same); Cater Depo. at 37–38 (after December 2002, some of McEvoy's accounting was not corrected by 7–Eleven because the franchise was treated as "closed"); McEvoy Statement at ¶ 3 (final accounting fails to give McEvoy credit for costs of authorized "non-standard inventory" and does not adjust for invoices sent from Klein Wholesale Distributors).[4]

### C. McEvoy's Claims Against 7–Eleven

### 1. Breach of Contract

McEvoy argues that 7–Eleven breached the agreement by failing to provide him

---

**4.** McEvoy correctly asserts that 7–Eleven cannot recover attorney's fees as damages for its breach of contract claim. McEvoy Mot. at 11; *St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 318 Md. 337, 345–46, 568 A.2d 35 (1990) (Generally no attorney's fees as damages unless: 1) the parties to a contract agreed to pay attorney's fees; 2) a statute allows such fees; 3) wrongful conduct of defendant forces plaintiff into litigation with third party; 4) plaintiff was forced to defend malicious prosecution; or 5) punitive damages are sought).

with competitive store facilities, an operable accounting system, and advertising, and by failing to cure the problems with the CDC. McEvoy Opp. at 25 (summarizing McEvoy's breach of contract claims against 7–Eleven). McEvoy asserts that these failures breached 7–Eleven's express or implied contractual obligations. *Id.*

### a. Failure to Make Repairs and Renovations

■■■ McEvoy has argued that 7–Eleven's conduct has breached implied duty of good faith and fair dealing. *See, e.g.,* McEvoy Opp. at 2 ("7–Eleven must perform its obligations in good faith"), 26 (accounting practices "violated 7–Eleven's duty of good faith and fair dealing"), Counterclaim at ¶¶ 25–26 (describing 7–Eleven's breach of obligations of good faith and fair dealing). The implied duty of good faith and fair dealing generally does little more than prevent one party from affirmatively frustrating the other's performance; it does not create new contract terms. *Eastern Shore Markets, Inc. v. J.D. Associates Limited Partnership,* 213 F.3d 175, 184 (4th Cir.2000).

Few Maryland cases have been decided on the implied covenant of good faith and fair dealing; some cases have used implied covenants to define obligations under ambiguous contracts. *See, e.g., Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 535, 200 A.2d 166 (1964) (in light of circumstances at the time the leases were made, Court could not "conclude that the parties impliedly covenanted that the lessees would not expand their business in the area of lessor's store"); *Automatic Laundry Service, Inc. v. Demas,* 216 Md. 544, 551, 141 A.2d 497(1958), *quoting Wood v.*

*Lucy Duff–Gordon,* 222 N.Y. 88, 90–91, 118 N.E. 214 (1917) ("A promise may be lacking, and yet the whole writing may be 'instinct with an obligation, imperfectly expressed' "); *Foster–Porter Enterprises v. De Mare,* 198 Md. 20, 34, 81 A.2d 325 (1951), *quoting Dreher Corp. v. Delco,* 93 F.2d 275, 277 (2d Cir.1937); *see also Julian v. Christopher,* 320 Md. 1, 9, 575 A.2d 735 (1990) ("[i]f the lease does not spell out any standard for withholding consent, then the implied covenant of good faith and fair dealing should imply a reasonableness standard").[5]

The implied covenant of good faith and fair dealing does not save McEvoy's failure to repair and renovate claim because that claim is based on 7–Eleven's alleged failures to act rather than its affirmative conduct. *Eastern Shore Markets,* 213 F.3d at 184.

Arguably, the agreement imposed an obligation upon 7–Eleven to renovate the store under certain circumstances. *See Pacific Indemnity Co. v. Interstate Fire & Casualty,* 302 Md. 383, 388–89, 488 A.2d 486 (1985) (contracts construed to effectuate the intent of the parties). In interpreting contractual language, the "test is what meaning a reasonably prudent layperson would attach to the term." *Id.* Paragraph 18 of the agreement is relevant to McEvoy's claim that 7–Eleven failed to repair and renovate his store:

"7 Eleven shall, when it deems necessary (i) repaint and repair the interior and exterior of the store ... (iv) repair the floor covering, exterior walls, roof, foundation, and parking lot ...; (v) maintain the structural soundness of the store ... and FRANCHISEE hereby

---

**5.** The implied covenant of good faith and fair dealing is derived from the intent and expectations of the parties. The implied covenant expresses fundamental intentions and expectations parties generally have regarding their performance under a contract. *Eastern Shore Markets, Inc. v. J.D. Associates Limited Partnership,* 213 F.3d 175, 184 (4th Cir.2000) ("An implied duty is simply a recognition of conditions inherent in expressed promises").

consents to such actions by 7–ELEVEN. 7–ELEVEN may charge the FRAN-CHISEE for any of the foregoing repairs, if, in 7–ELEVEN's opinion, such repairs are occasioned by FRANCHISEE's abuse or neglect."

Agreement at ¶ 18.

Plaintiff 7–Eleven claims that this provision unambiguously grants it wide discretion to determine if and when it will renovate or repair one of its stores. *See* 7–Eleven Mot. at 10("the Agreement gives [7–Eleven] wide discretion over its spending for capital improvements").

■ Although the agreement granted 7–Eleven the right to determine whether repairs and renovations were required, it did not define how these decisions were to be made. Agreement at ¶ 18. When a party to a contract is granted discretion to make decisions without an express standard to guide the its use, Courts will infer that the parties intended the discretion to be used reasonably as opposed to arbitrarily and capriciously. *Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735 (1990). Accordingly, ¶ 18 of the agreement required 7–Eleven to reasonably exercise its discretion in determining whether or not repairs and renovations are necessary at a given store. *See id.*

■ McEvoy testified that his store was decrepit and unable to compete with newer competitors' facilities. *See, e.g.,* McEvoy Sworn Statement at ¶ 4 (McEvoy's store "was in a serious state of disrepair"),¶ 5 (McEvoy's store "needed a new roof ... [because] not only did the roof leak, but the multi-colored repairs were visible from the road and [were] extremely unattractive"), ¶ 6 (store needed new beverage coolers because current coolers prevented McEvoy from "fully participating in 7–Eleven's programs involving Coca Cola, Pepsi, and Royal Crown"), ¶ 8 (7–Eleven refused to expand McEvoy's store and add the gasoline pumps that newer 7–Eleven's have).

Under these circumstances, a reasonable jury could find that 7–Eleven unreasonably failed to exercise its discretion to renovate and repair McEvoy's store. Accordingly, summary judgment on McEvoy's breach of contract claim regarding 7–Eleven's failure to repair and renovate his store will be denied.

### b. Accounting Errors

The agreement expressly required 7–Eleven to "establish and maintain" an open account for franchisees. Agreement at ¶ 11. The Agreement also required 7–Eleven to:. i) provide financial summaries for franchisees based on 7–Eleven's book keeping; ii) provide payroll checks for the franchisee's employees; iii) timely. pay bank drafts and invoices for purchases verified by vendor statements; and iv) assist franchisee in the preparation and filing of business tax reports and returns "to the extent the information is available from the Bookkeeping Records." Agreement at ¶ 10. McEvoy does not allege that 7–Eleven violated any of these express contractual provisions.

Instead, McEvoy testified that the new accounting system was more difficult to use and less accurate than the old system and required him to spend twice as much time doing accounting work. McEvoy Depo. at 14 (Under new accounting system "[n]o one checks [accounting]"), 15 (new accounting burdens prevented hindered McEvoy's customer service), 25 (after changes, McEvoy's accounting took 40% of his time as opposed to 20% under the old system). McEvoy claims this frustrated his performance under the agreement because it substantially reduced the amount of time he was able to spend with customers and prevented him from timely submit-

ting his paperwork. *Id.;* McEvoy Opp. at 25.

Because 7–Eleven affirmatively acted by removing safeguards in the accounting system that were already in place, McEvoy can demonstrate a breach of the implied duty of good faith if he proves that the changes frustrated his performance under the contract. *Eastern Shore Markets,* 213 F.3d at 184 ("the implied duty of good faith and fair dealing as recognized in Maryland requires that one party to a contract not frustrate the other party's performance ").

■ A plaintiff's business must be substantially harmed for a violation of the implied duty of good faith and fair dealing. *See Automatic Laundry Service, Inc.,* 216 Md. at 548, 550, 141 A.2d 497 (profit under the agreement "was almost wiped out"); *Eastern Shore Markets, Inc.,* 213 F.3d at 185 (sufficient harm to implicate a breach of the implied covenant of good faith and fair dealings when the defendants "wilfully undermined [plaintiff's] profitability and threatened its viability").

■ McEvoy has not provided evidence of his profits before and after the accounting changes. Instead, McEvoy has offered evidence that after the changes he spent twice as much time doing accounting work which prevented him from complying with his reporting and deposit obligations and kept him from interacting with his customers. McEvoy Depo. at 15, 25. This evidence creates a reasonable inference that 7–Eleven's accounting changes have, to some extent, frustrated McEvoy's performance under the agreement. Because the Court cannot weigh the evidence to determine whether these changes have substantially diminished the value of the agreement, McEvoy has raised a genuine

issue of material fact regarding his accounting practices claim. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348.

### c. The Combined Distribution Center

■ McEvoy frames his breach of contract claim regarding the CDC as follows: "7–Eleven has breached the Franchise Agreement and related agreements … [through] its implementation of the CDC which resulted in higher costs, lower merchandise quality and lower profits to McEvoy." McEvoy Opp. at 25, *quoting* Counterclaim at ¶ 25.[6] Accordingly, McEvoy claims that 7–Eleven's implementation of the CDC program violated the franchise agreement. *Id.*

McEvoy has not identified any provision in the agreement that 7–Eleven violated. Instead, McEvoy's claim rests on his assertion that the CDC's operation violated implied duties of good faith and fair dealing. 7–Eleven Mot. at 13 (noting that the agreement does not mention the CDC); *see* McEvoy Opp. at 12–14.

The record indicates that although 7–Eleven encouraged CDC participation, the franchisees themselves elected to purchase goods from the CDC. McEvoy Depo. at 77 (use of CDC was "suggested"). When there were CDC problems, they were logistical. *Id.* (CDC delivered orders that were stale or damaged by delivery drivers). McEvoy has not offered evidence that 7–Eleven sabotaged the CDC program or required him to participate in the program. Accordingly, because the CDC problems are not alleged to have been caused by 7–Eleven's affirmative acts, as a matter of law, the CDC did not violate the implied covenant of good faith and fair dealing. *Eastern Shore Markets,* 213 F.3d at 184.

6. To the extent that McEvoy's allusion to "related agreements" in the counterclaim refers to the a CDC contract, McEvoy has not advanced a breach of contract action based on the terms of the agreement governing the CDC.

#### d. Failure to Advertise

■ The agreement grants extensive discretion to 7–Eleven to decide how and when to advertise. Agreement at ¶ 20 ("7–ELEVEN shall provide FRANCHISEE with advertising materials ... as 7–ELEVEN in its sole opinion desires"). The agreement gives 7–Eleven the authority to advertise when "in its sole opinion" it appears appropriate. 7–Eleven Mot. at 14; 7–Eleven Mot. Ex. A ¶ 20. There is evidence that 7–Eleven spent hundreds of thousands of dollars advertising in McEvoy's geographic market. Hanson Depo. at 103 (Baltimore advertising budget was $772,500 in 2002, $695,100 in 2001, around $883,000 in 2000, and $967,700 in 1999). McEvoy argues that 7–Eleven should have spent more money advertising.

McEvoy has not offered any evidence that relates the decrease in advertising expenditures to harm to his franchise. Accordingly, because there is no evidence from which a jury could determine whether 7–Eleven's advertising budget frustrated McEvoy's performance under the agreement, summary judgment will be granted to 7–Eleven on McEvoy's advertising claim.

#### e. The "7–Eleven System"

McEvoy also contends that the agreement's reference to the "7–Eleven System" imposes additional duties upon the franchisor. McEvoy Opp. at 24. The opening paragraph of the agreement requires the franchisee to operate his or her store "pursuant to the 7–Eleven system, as from time to time determined by 7–Eleven in its sole discretion (whether or not any changes therein are within the present contemplation of the parties)." Agreement at page 1.

The agreement defines the "7–Eleven System" as a way of describing the common packaging and presentation of goods and services at stores readily identifiable by 7–Eleven's trademarks and trade dress. Agreement, Exhibit E at pages 1–2. The "7–Eleven System" does not impose accounting, renovation, advertising, or repair obligations beyond those appearing elsewhere in the agreement. *Compare* Agreement, Ex. E *with id.* at ¶ 18 ("Maintenance and Utilities"); *id.* at ¶ 20 ("Advertising"). Furthermore, the agreement allocates to 7–Eleven the sole discretion to define and revise the "7–Eleven System." Agreement at page 1. Accordingly, McEvoy has not demonstrated a breach of the express terms of the agreement relating to the "7–Eleven System." [7]

#### 2. Wrongful Termination

■ McEvoy has not identified any Maryland case or statute that creates a cause of action for the wrongful termination of a general franchisee.[8] Summary judgment for 7–Eleven is therefore appropriate on McEvoy's wrongful termination claim.

#### 3. Negligence

■ McEvoy argues that 7–Eleven has negligently operated the CDC and its accounting system in a manner that breached a duty it owed to McEvoy, proximately causing injury to him. McEvoy Opp. at

---

7. The agreement commits that continual refinement of the 7–Eleven System to "7–Eleven in its sole discretion." Agreement at page 1; id. at Ex. E.

8. Some types of Maryland franchises are protected by federal and state statutes such as the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806. *Mikeron, Inc. v. Exxon Company, U.S.A.,* 264 F.Supp.2d 268, 270–71 (D.Md.2003) A similar statutory cause of action exists for automobile dealerships under both federal and Maryland law. *See, e.g., Wootton,* 134 F.Supp.2d at 716–17, *explaining* 15 U.S.C. § 1221 *et seq.;* Md.Code Ann.,Transportation. § 15–207.

28. 7–Eleven argues that this negligence claim must fail because McEvoy has not identified an independent tort duty that 7–Eleven owed to him. 7–Eleven Mot. at 15. To sustain a cause of action for negligence, the defendant must be under a duty to protect the plaintiff from harm. *Jones v. Hyatt Insurance Agency, Inc.,* 356 Md. 639, 653, 741 A.2d 1099 (1999). "A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis." *Id.* at 653–54, 741 A.2d 1099. Furthermore, when the only harm likely to occur is economic, rather than physical, a confidential relationship or its equivalent is required for tort liability. *Id.* at 658, 741 A.2d 1099; *O'Neal v. Burger Chef Systems, Inc.,* 860 F.2d 1341, 1350 (6th Cir.1988)(no inherent fiduciary or confidential relationship arises from franchise agreement). Accordingly, 7–Eleven had no tort duty to prevent McEvoy from suffering economic harm, his negligence claim fails as a matter of law. *Id.* at 653–54, 658, 741 A.2d 1099.

### 4. Fraud

McEvoy alleges that 7–Eleven committed fraud by applying a default 38% retail markup when paperwork was missing and by making accounting errors. McEvoy Opp. at 34. According to McEvoy the accounting errors resulted from incorrect data entry and 7–Eleven's knowledge that the CDC did not always deliver what the franchisee's ordered. *Id.* Ultimately, McEvoy claims that these fraudulent practices resulted in the appearance that he had a negative net-worth, which was one of 7–Eleven's justifications for the termination of his franchise. *Id.* at 34–35.

■ In Maryland, fraud requires the plaintiff to prove, by clear and convincing evidence, that: (1) the defendant made a false statement to the plaintiff; (2) the defendant knew the statement was false or

was recklessly indifferent to its truth; (3) the misrepresentation was made for purposes of defrauding plaintiff; (4) the plaintiff was entitled to rely on the misrepresentation and did so; and (5) the reliance resulted in compensable injury. *Alleco Inc. et al. v. The Harry & Jeanette Weinberg Foundation, Inc. et al.,* 340 Md. 176, 195–96, 665 A.2d 1038 (1995), *and cases therein; see also First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md.App. 97, 838 A.2d 404 (Md.Ct.Spec.App. 2003) at * 48–49.

■ McEvoy's first fraud claim, which involves 7–Eleven's practice of entering a 38% retail mark-up until the franchisee submitted the actual pricing data, fails on multiple bases. Carter Depo. at 119–21 (38% mark-up was applied when franchisee did not submit inventory data and would be changed to reflect actual mark-up when data was submitted); McEvoy Depo. at 104 (McEvoy explaining 7–Eleven's mark-up policy, from its point of view, as "we want them to turn in paperwork on time, so we are going to put a weird gross profit" on items); *id.* at 106 ("[I]f [the invoices were not] turned in … that's the only time they [applied the mark-up] …[and] after it was turned in, the correction was made"). McEvoy was on notice that he could not rely upon the accuracy of the 38% mark-up and could avoid, or correct, the mark-up by submitting the proper paperwork. *See id.; Alleco Inc.,* 340 Md. at 195–96, 665 A.2d 1038 (to prove fraud, plaintiff must be both entitled to rely on the misrepresentation and actually have done so).

There is no evidence of 7–Eleven's fraudulent intent. *Id.* Instead the record indicates that the number was used to encourage the franchisees to submit proper paperwork. *Id.; see* McEvoy Depo. at 104, 106 (McEvoy knew the circumstances

under which 38% mark-up would be applied).

McEvoy also bases fraud claims on 7–Eleven's: 1) "data input errors;" and 2) use of the franchisees' CDC orders despite its knowledge that "the franchisees did not get what they ordered." McEvoy Opp. at 34.[9] First, the record indicates that 7–Eleven did not represent to the franchisees that the accounting numbers were accurate; franchisees are given the numbers to make corrections. McEvoy Depo. at 15 ("[7–Eleven] would send [the accounting records] back to me to review and correct which would take me time"); *see also* McIver Depo. at 34 ("Sometimes the [CDC] orders are not delivered exactly so the franchisee would need to make corrections").[10] There is no evidence that 7–Eleven made intentional accounting errors, was recklessly indifferent to the accuracy of its accounting, or made any representations about the accuracy or adequacy of the accounting system. *Alleco*, 340 Md. at 195–96, 665 A.2d 1038. McEvoy's fraud claims fail as a matter of law and 7–Eleven is entitled to summary judgment in its favor.

### D. McEvoy's Motion for Sanctions

 McEvoy seeks sanctions against 7–Eleven because it failed to provide a timely pre-trial order in violation of Local Rule 106 and the scheduling order. Mot. for Sanctions at 1–2. As punishment, McEvoy seeks an order prohibiting 7–Eleven "from introducing witnesses and documents in support of its claims, and awarding attorney's fees to McEvoy." Mot. for Sanctions at 1. Plaintiff 7–Eleven has responded by stating that the delay resulted from an oversight and denies that prejudice resulted from it. Opp. to Motion for Sanctions at 1–2.

Fed.R.Civ.P. 16(f) states that when there has been a violation of a scheduling order:

"the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust."

McEvoy's request that the Court preclude 7–Eleven from presenting evidence at trial is not warranted. *See, e.g., John v. State of Louisiana*, 828 F.2d 1129, 1132 (5th Cir.1987)(abuse of discretion to dismiss case with prejudice when counsel's "inept but not purposefully obstructive" actions resulted in late filings); *Ford v. Fogarty*, 780 F.2d 1582, 1583 (11th Cir.1986)("party's simple negligence in complying with a court's order does not warrant dismissal").[11]

Based on 7–Eleven's admitted negligence, some sanctions may have been appropriate if McEvoy had demonstrated that he was harmed by 7–Eleven's delay. *Smith v. Chicago School Reform Board of*

---

**9.** Based on McEvoy's testimony, it is clear that not all the accounting errors were made by 7–Eleven. McEvoy described the franchisee as having a very significant role in the process. McEvoy stated: "[T]heir [accounting] system is data processing. You send the paperwork in. No one checks it. No one calls you and tells you if there is a problem. They process the paperwork. They put the burden of the accounting now onto the franchisee." McEvoy Depo. at 14.

**10.** McEvoy's single citation to the record does not contradict McIver's assertion that franchisees could correct accounting mistakes involving CDC deliveries. *See* McEvoy Opp. at 34–35.

**11.** Though McEvoy has not requested that the Court dismiss 7–Eleven's claims outright, that would be the effect of preventing it from offering evidence of its claims at trial.

*Trustees,* 165 F.3d 1142, 1148 (7th Cir. 1999)("If delay caused demonstrable harm, for example by requiring [plaintiff's] lawyers to work longer hours, the judge could have ordered defense counsel foot the bill"). McEvoy has not, however, offered evidence of harm. Accordingly, McEvoy's motion for sanctions will be denied without prejudice.

III. Conclusion

Summary judgment for 7–Eleven will be granted on McEvoy's wrongful termination, negligence, and fraud claims. Summary judgment will be denied on McEvoy's breach of contract claims regarding 7–Eleven's failure to repair and renovate his facility and 7–Eleven's removal of certain accounting safeguards. Summary Judgment will be granted on the remainder of McEvoy's breach of contract claims. Summary judgment will be granted to 7–Eleven on McEvoy's liability for breach of contract; 7–Eleven will be required to prove its damages at trial.

Summary judgment for McEvoy will be granted on 7–Eleven's moot claims for injunctive relief, ejectment, and recovery of chattels. Summary judgment for McEvoy will be denied on 7–Eleven's trademark infringement and dilution claims. McEvoy's motion for sanctions will be denied without prejudice.